Green, J.
delivered the opinion of the court.
This is a bill to recover a number of negro slaves. The complainants claim by virtue of a deed of gift from Charles Sallard, dated in 1841. The complainants have prosecuted *81 a previous suit for the same slaves, in which they asserted a right to the negroes by virtue of a verbal gift from Charles Sallard to Eleanor, the daughter of the defendant and wife of the complainant, O. McKissick. That case is reported in Meigs Rep. 427, from which it will be seen that the complainants failed to establish a title to the property; and their bill was dismissed as to the slaves now in controversy. After the decision of that cause, Charles Sallard, from whom the negroes were originally obtained by the defendant, made a deed of gift of them to the complainants. This bill is filed to set up and enforce the right the complainants claim to have derived from that deed.
Although the former suit was between the same parties, and for the same property, yet the title which is set up in the present suit did not then exist and was not adjudicated. The question is therefore open to the investigation of Charles Sal-lard’s title to those slaves. For the complainants can now only claim such title as Charles Sallard had in 1841, and which he conveyed to them.
2. It appears from this record that in 1814, the defendant, Wm. McKissick, married the daughter of Gharles Sallard of Person county, North Carolina. Soon after this marriage, Sallard put three negro slaves (from whom all the others for which this suit is brought descended) into the possession of his son-in-law, McKissick, without any express contract as to the character in which they were to be holden, and without any writing. Mrs. McKissick died in a year or two, leaving the complainant Eleanor an infant, her only child. Shortly after the death of Mrs. McKissick, Mr. Sallard and Wm. McKissick, the defendant, had a conversation about the negroes, in which Sallard said, he wished his grand-daughter, Eleanor, the daughter of defendant, to have the negroes, and if she died without heirs, McKissick should have them. Mc-Kissick said he was willing it should be so. After this conversation, Sallard says he has set up no claim to these ne-groes. In 1832, McKissick moved from North Carolina to Tennessee, where he has held and possessed these slaves until this time. There are many depositions as to the character of the defendant’s possession, and the knowledge of Sal *82 lard of a claim adverse to his title. Some of the witnesses state that the defendant professed to hold for Eleanor, and others state that he claimed to hold the negroes in his own right and as his own property. In 1833, the complainant Eleanor and the complainant Orville McKissick intermarried. In 1836, they filed their bill for the negroes now in controversy, alleging that a verbal gift had been made to Eleanor by her grand-father, Sallard. In July,1837, the deposition of Sallard was taken in that cause by the complainant, and shortly afterwards it was again taken by the defendants.
This bill was filed in 1832. Upon these facts the question is, whether after a possession, which had continued, twenty-eight years, under these circumstances, Charles Sallard, the original owner of these negroes, would be entitled to assert his right and recover them from McKissick. For the complainants have no other ground of recovery than that derivable from-Sallard’s deed of 1841.
1. It is assumed in the first place that as the transactions in relation to these slaves occurred in North .Carolina, the rights of the parties, when McKissick brought the negroes to Tennessee, were such as by the statutes and adjudications of North Carolina they would have been regarded. The correctness of this principle is not controverted. A right is to be determined according to the law of the country where the contract was made; but the remedies for its enforcement are to be applied according to the law of the forum.
2. It is next assumed that by the statute of North Carolina of 1806, a gift of slaves is void, unless it be made in wri-ing, and that by the judicial determinations in that State the donee of a slave by a verbal gift is only a bailee for the donor and does not hold the slave adversely to the title of the donor, and that when McKissick brought the slaves to Tennessee they were in his possession as Sallard’s bailee. That a verbal gift of a slave is void by the North Carolina act of 1806, is true, and it is also true that the courts of that State have held that the donee does not hold possession adversely to the title of the donor. Such gift becomes by operation of law a bailment and can be determined only as bailments by contract are determinable. As the result of these decisions the *83 defendant acquired no title by the statute of limitations while he remained in the State of- North Carolina. And it may be conceded that after he brought the property to Tennessee, the legal rights of the parties were the same as when the negroes were in North Carolina; but so soon as the property came to Tennessee, our statute of limitations acted upon the facts as they really existed. If, in point of fact, the defendant was in adverse possession of these slaves in North Carolina — ''although the courts qf that State would adjudge such facts as constituting only a bailment — the moment he came to Tennessee our law adjudges the character of the possession according to the facts, and the statute of limitations commences running. If, in North Carolina, ■ a party ■holds possession adversely in fact, and continues the same character of possession after he comes to Tennessee, no matter what construction the North Carolina law may place upon such possession, it is competent for us to look at the facts as they really existed in North Carolina, and determine the character of the possession according to our construction. This we may do, not to determine that the North Carolina statute of limitations operated in favor of the defendant, but with a view to determine the character of his possession from the period of his arrival in Tennessee. These antecedent facts enable us to arrive at a knowledge of the true nature of the possession here. In this view of the case, there can be no doubt but that the possession of the defendant has been actually adverse to Sallard, ever since the' conversation detailed in Sallard’s deposition, which'occurred soon after the death of the mother of the complainant, Eleanor. On that occasion, if not before, Sallard made a gift of these slaves. He considered himself as having parted with all his right to them. He states in his deposition that he has set up no claim to them since that time, and he has said to others that he had given them away. This court has uniformly' held that a possession under such verbal gift, for three years, conferred a title to slaves upon the possessor. In the case of Turner vs. Grainger, 5 Hump. R. 348, the last case upon this subject, it is held that, “If in addition to delivery, there be an express gift of the property, although verbal, the possession of the *84 donee would, from the nature of the transaction, be for himself exclusively, and the statute would commence running; and if the donor did not, by suit or otherwise, reclaim the property, the title — not by operation of the gift and delivery, indeed, but by the adverse possession and the statute — would be vested in the donee against the donor and others. The verbal gift in such a case, invalid as conferring title, would yet serve to manifest and establish the nature and character of the donee’s possession.” Our confidence in the correctness of these views is not at all shaken by the cases from North Carolina, where a different opinion prevails; and applying these principles to the facts of this case, there is no doubt but that the statute of limitations commenced running from the time the defendant came to Tennessee in 1832. For whatever doubt there may be as to whether he held possession for himself or for his daughter, Eleanor, there can be none but that he held it adversely to Sallard. If, as was alleged, in the former suit, the defendant had held the negroes in trust for Eleanor, under a verbal gift to her from her grandfather, that possession would have been adverse to Sallard’s title, and would have extinguished it. So, also, if he held for himself and not for Eleanor. In either case, the possession would have been hostile to the title now in litigation. But if it were conceded that after the defendant came to this State, he continued to hold the slaves as bailee for Sallard, up to 1806, when the complainants commenced their other suit, it can scarcely be pretended that he did not hold them adversely to all persons after that date. And this fact must have come home to the knowledge of Sallard. His deposition was twice taken in that suit, and from the character of the interrogatories and the nature of the evidence, he could not fail to know that the defendant claimed the negroes for himself; and from that period to the commencement of this suit, five years elapsed. In this view of the case, also, the ■ statute of limitations is a bar to the relief sought in this bill.
The decree must be reversed, and the bill dismissed with costs.